IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| PAUL WOOLEY, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 2-02CV-323-TJW |
| | § | |
| XTERA COMMUNICATIONS, INC., | § | |
| | § | |
| DEFENDANT. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

**NOW INTO COURT COMES** Plaintiff, Paul Wooley ("Wooley"), and files his Original Complaint against the Defendant, Xtera Communications, Inc. ("Xtera"), and for causes of action against Xtera, Wooley would show to the Court and jury as follows:

### I.

### PARTIES

1. Wooley is a resident of Shreveport and a citizen of the State of Louisiana.

2. Xtera is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in the Allen, Collin County, Texas. Xtera may be served with summons and complaint by serving its registered agent for service of process, CT Corporation, 350 N. St. Paul Street, Dallas, Texas 75201.

## II.

### JURISDICTION AND VENUE

3. This Court has jurisdiction over this matter on the basis of diversity of citizenship as set forth in **28 U.S.C. § 1332**, in that the amount in controversy exceeds, exclusive of interest and costs, the sum of Seventy Five Thousand and No/100 Dollars ($75,000.00), and the parties are citizens of different states.

4. Venue is proper in this judicial district under **28 U.S.C. §1391**.

5. Texas law governs the substantive issues in this case.

## III.

### FACTUAL BACKGROUND

#### *Xtera*

6. In May 2000, Xtera established its corporate headquarters in the telecommunications technology corridor in North Texas.

7. Xtera is an optical networking company providing innovative transport solutions.

8. Xtera received **$133 million** in equity funding from such premier venture capital firms as ComVentures, Sevin Rosen, New Enterprise Associates, ARCH Venture Partners, EDF Ventures, Hook Partners, Rho Ventures, Star Ventures Management, CenterPoint Venture Fund and Berkeley International, in order to develop its product and technology concepts entitled Wide Reach™ ("Wide Reach").

9. Xtera has now developed its product and technology concept that it calls Wide Reach.

10. Xtera markets the Wide Reach product solutions to deliver bandwidth that major carriers need to service their respective markets.

11. Xtera touts that the Wide Reach product solutions enable superior network solutions, which enhances a carrier's competitive positions at the lowest cost, while at the same time broadening addressable markets to increase market share opportunities.

12. Xtera now believes that it is positioned to produce critical technology and product solutions that solve bandwidth needs of carriers at dramatically lower costs.

13. Employees such as Wooley were vital to the development process of the Wide Reach product solutions.

### *Wooley is Hired*

14. Wooley was hired by Xtera as a Senior Compliance Engineer in October 2000, which was similar to other technology positions that he previously held in the Dallas/Fort Worth Metroplex.

15. Due to the substantial investments from the venture capital firms and the desire to get to market first, enormous pressures were placed upon technology employees such as Wooley to test and to certify the compliance of each and every critical part.

16. In February 2001, as a result of the stress and pressure from Xtera, Wooley suffered a heart attack, from which he recovered. Upon his return to work at Xtera, Wooley again was placed back into the pressure cooker with the demands of Xtera and its venture capital investor partners to get the product tested and compliant so that it could be brought to the market quickly.

17. Wooley's day-to-day activities included testing component parts for the technology Xtera was developing for suitability, as well as compliance with applicable federal standards.

18. The component parts Wooley tested were to have been scheduled and regularly ordered and by his superiors. When component parts were not properly scheduled or were not ordered the testing process was either delayed or halted.

19. After many instances of failing to order necessary component parts and disagreements by the supervisors over who had responsibility to order component parts, Wooley began looking into other employment opportunities to reduce the day-to-day stress.

20. On May 16, 2002 Wooley was preparing to test component parts when he discovered that the necessary parts had not arrived.

21. Wooley then discussed the component parts problem with his supervisor. The supervisor was unable to account for the problem associated with the component parts and Wooley was no longer interested in further discussion concerning this repetitious problem.

### *Wooley Resigns*

22. Wooley informed his supervisor that he would leave the testing project to him, and that he was quitting, effective immediately.

23. Wooley went to the Human Resource Department, resigned from his position as Senior Compliance Engineer at Xtera and turned in his keys and pass card.

24. Wooley's senior supervisor attempted to discuss the problem with Wooley, who informed him that he had resigned and was leaving.

25. Wooley then gathered his personal belongings, removed them from his office and took them to his truck.

26. Before leaving the Xtera parking lot, Wooley, along with the manager of the Human Resource Department, unloaded supplies Wooley had purchased on behalf of the company. Wooley stacked the supplies against the Xtera building.

27. Generally, the employees of Xtera, and in particular the co-worker with whom Wooley was closest, were completely unaware that Wooley had resigned until after he left the Xtera facilities.

28. In the process of Wooley resigning, there were no unusual activities or disruptions of any kind, apart from Xtera's loss of a critical and key employee.

### *Wooley Departs*

29. At all material times prior to May 16, 2002 Wooley was a free, law abiding, tax paying citizen of this community and this state.

30. Wooley then left Xtera and drove to his residence.

31. At his home, Wooley packed for a much needed vacation of fishing and hunting.

32. Although he had no specific travel plans, Wooley intended to go to Colorado and then perhaps to points as far north and west as Alaska.

### *The Shooting*

33. At approximately 12:50 p.m. Wooley was traveling north on U. S. Highway 75 towards Oklahoma.

34. An unidentified male assailant was believed to have fired a rifle from a distance at two nurses returning from their lunch break at the North Central Medical Center ("Medical Center") in McKinney, Texas.

35. As Wooley was traveling north he was unaware of the incident that occurred at the Medical Center at approximately 1:33 p.m.

36. One of the nurses, Amy Wingfield ("Wingfield"), died at the scene.

37. The other nurse, Alisa Stewart ("Stewart"), was severely wounded and hospitalized for an extended period of time.

38. This tragedy was the first murder in McKinney in the calendar year of 2002.

### *Wooley Learns of the Shooting*

39. Wooley first learned of the shooting in a conversation with one of his former co-workers when he was in Oklahoma, driving to Oklahoma City.

40. Wooley had never met nor had any contact with Wingfield or Stewart.

41. Neither Wingfield nor Stewart knew of or had any contact with Wooley.

42. Wooley did not know that Xtera's Human Resource manager and his wife were close personal friends of Wingfield and her husband, and that they socialized frequently.

43. Wooley did not know that Xtera's Human Resource manager had a brother who was a police officer with a local law enforcement agency.

44. Wooley did not know that Xtera had reported him as a suspect to local law enforcement on the day of the shootings.

### *The Negligent and/or Improper and/or Unlawful Activities*

45. The only reason that Wooley became the suspect was due to the false, misleading and inaccurate information provided by Xtera to the Allen Police Department ("Allen PD") and McKinney PD ("McKinney PD").

46. The false, misleading and inaccurate information about Wooley was provided initially by Xtera to the Allen PD during the late morning and early afternoon of May 16, 2002.

47. No meaningful investigative efforts were undertaken by the Allen PD that verified, confirmed or corroborated the accuracy or the truthfulness of any information received from Xtera.

48. The information provided by Xtera to the Allen PD was then provided to the McKinney PD.

49. No investigative efforts were undertaken by the McKinney PD that verified, confirmed or corroborated the accuracy or the truthfulness of any information received from Xtera.

50. McKinney PD transmitted the Xtera information concerning Wooley to law enforcement agencies throughout the state of Texas, including the Amarillo Police Department ("Amarillo PD") and to the news media.

### *Elk City, Oklahoma*

51. Wooley spent the evening in Elk City, Oklahoma on May 16, 2002.

52. That evening Wooley suffered chest pains and sought out medical attention from the local hospital.

53. Wooley was examined and evaluated, and then released the following morning.

### *Amarillo, Texas*

54. Wooley then drove from Elk City, Oklahoma to Amarillo, Texas where he checked into a La Quinta Motel.

55. After getting situated in his room, he contacted the desk clerk to determine the availability of a local minister.

### *Amarillo Police Department*

56. Shortly after placing the phone call, two Amarillo Police telephoned Wooley in his room and requested that he step out of his hotel room to talk with them.

57. The Amarillo Police officers announced who they were and indicated that they were there to check on him.

58. Wooley invited the officers into the room, told them he was traveling, that he was not suicidal and that he had a rifle, a handgun and a hunting knife.

59. The officers told Wooley they would take possession of his weapons and take them to the Amarillo Police Department where they would remain until he was medically cleared.

### *Northwest Texas Healthcare System*

60. Wooley was instructed to go to the Northwest Texas Healthcare System ("Northwest") for evaluation.

61. Wooley went to Northwest as instructed.

62. Wooley was not provided with anything more than nominal attention and little, if any, medical care at Northwest.

63. No diagnosis was made that would justify the hospitalization of Wooley in the first instance.

64. Wooley was prevented from leaving or checking himself out of Northwest.

65. Wooley was kept at Northwest against his will as the City of McKinney, Texas Police Department ("McKinney PD") attempted to make a case against him for the murder of Wingfield.

### *Wooley is Falsely Accused*

66. On Friday morning May 17, 2002 Carl DeWilde ("DeWilde"), the Chief Operating Officer of Xtera, conducted an employee meeting.

67. At the employee meeting, DeWilde announced, among other things, that Xtera had grossly overreacted by informing law enforcement agencies that Wooley was involved in the shootings and the murder of Wingfield and it was now clear that Wooley had nothing to do with the death of Wingfield.

68. Despite Xtera's knowledge that it had grossly overreacted in reporting Wooley's involvement to law enforcement agencies as the shooter and the murderer, Xtera did absolutely nothing on or after May 17, 2002 to notify or inform law enforcement agencies and/or the media that it had falsely accused Wooley.

69. On or after May 17, 2002 Xtera continued to allow local law enforcement agencies to conduct interviews of its employees on site, concerning Wooley and Wooley's involvement in the Wingfield murder.

70. On or after May 17, 2002 Xtera continued to provide statements and interviews and issued press releases to local law enforcement agencies and the media.

71. On or after May 17, 2002 Xtera concealed relevant and pertinent information and evidence from local law enforcement agencies and the media concerning Wooley and his innocence.

72. On or after May 17, 2002 Xtera concealed relevant and pertinent information and evidence from local law enforcement agencies and the media concerning the fact that Wooley had not made threatening phone calls to the Xtera offices as was previously alleged..

73. On or after May 17, 2002 Xtera made no effort to correct or remedy the information and evidence it provided to local law enforcement agencies and the media, and in fact concealed relevant facts and evidence it obtained from Xtera employees concerning Wooley and his innocence.

74. On or after May 17, 2002 Xtera continued to mislead local law enforcement so as to obtain round the clock surveillance and protection for the Xtera office complex.

75. On or after May 17, 2002 Xtera stated, conveyed and implied to prospective employers of Wooley that Wooley was involved in the shooting and murder of Wingfield and that he was not suitable for employment.

### *The Arrest*

76. Wooley was arrested by the Amarillo PD based upon an arrest warrant obtained by the McKinney PD and was picked up at the Northwest Hospital where he had been held against his will.

77. Wooley was taken into custody by the Amarillo PD and held until representatives of the McKinney PD made arrangements to pick him up and then flew him back to McKinney, Texas.

78. Upon his arrival in McKinney, the McKinney PD transported Wooley to the Collin County Jail where he was held until May 22, 2002.

### *The Incarceration*

79. While incarcerated in Collin County, Wooley was denied his medications which had been prescribed to treat conditions related to his heart attack and the associated depression.

80. While incarcerated in Collin County, Wooley was subjected to unreasonable and inappropriate treatment which included, but was not limited to:

   A. Continuous and repetitious humiliation by female jailers regarding his sexual preferences, his manhood and his personal hygiene;

   B. Continuous and repetitious efforts to obtain or secure a confession at a time when he was not represented by counsel, when it was known that he was not involved in the shooting and murder of Wingfield and continuing those efforts through and past the time of the actual murderer of Wingfield had confessed;

C. Continuous and repetitious efforts to frighten and intimidate Wooley by stating that he was going to fry;

D. Continuous and repetitious efforts to frighten and intimidate Wooley by stating that he was going to be transported to Terre Haute, Indiana to be physically evaluated by the only doctor that was willing to see him. Terre Haute, Indiana of course is the site where federal executions are carried out.

81. While incarcerated Wooley was denied adequate clothing, placed in an environment where the temperature was at or below 60 degrees and provided bedding that was less than two inches of foam and a blanket the size of a bath towel for use on a concrete floor.

82. On an after May 19, 2002 all law enforcement agencies knew that Wooley was not and had not been involved in the McKinney shooting and the murder of Wingfield.

83. McKinney PD kept Wooley incarcerated not less than three days after it knew that Wooley was not and had not been involved in the McKinney shooting and the murder of Wingfield.

84. Wooley was released from jail on May 22, 2002.

### *False and Defamatory Statements*

85. Xtera widely circulated false and disparaging statements concerning Wooley and his involvement in the shootings and the murder of Wingfield, as well as regarding his reputation.

86. The false and defamatory statements made and transmitted by Xtera concerning Wooley were unequivocally false.

87. The false and defamatory statements made and transmitted by Xtera concerning Wooley were of the sort calculated to cause Wooley harm both personally and professionally.

88. The false and defamatory statements made and transmitted by Xtera concerning Wooley were the cause of Wooley's arrest and extended incarceration for the murder of Wingfield.

89. Xtera transmitted the false and defamatory statements fraudulently and maliciously, knowing that they were false and intending for them to be widely repeated by law enforcement agencies and the news media in order to harm and to destroy him personally and professionally.

## IV.

### *Negligence*

90. Wooley incorporates the allegations set forth in paragraphs 1 through 89 above, herein as if set forth verbatim.

91. Xtera's actions and conduct concerning Wooley and his alleged involvement in the shootings and the murder of Wingfield were the cause of Wooley's arrest and extended incarceration for the murder of Wingfield.

92. Xtera's actions and conduct concerning Wooley and his alleged involvement in the shootings and the murder of Wingfield constitute negligence and the proximate cause of the damages and injuries sustained by Wooley.

93. Wooley is entitled to recover his actual damages resulting from the actions and conduct of Xtera.

## V.

### *Gross Negligence*

94. Wooley incorporates the allegations set forth in paragraphs 1 through 93 above, herein as if set forth verbatim.

95. Xtera's actions and conduct concerning Wooley and his alleged involvement in the shootings and the murder of Wingfield were the cause of Wooley's arrest and extended incarceration for the murder of Wingfield.

96. Xtera's actions and conduct concerning Wooley and his alleged involvement in the shootings and the murder of Wingfield were malicious, reckless, willful and in complete disregard of the rights of Wooley and therefore constitute gross negligence.

97. Wooley is entitled to recover exemplary and/or punitive damages resulting from Xtera's actions and conduct that were malicious, reckless, and willful and in complete disregard of the rights of Wooley.

## VI.

### *Slander, Slander Per Se and Defamation*

98. Wooley incorporates the allegations set forth in paragraphs 1 through 97 above, herein as if set forth verbatim.

99. The false statements made by Xtera constitute slander, slander per se and defamation of Wooley's character personally and professionally.

100. As a direct and proximate result of Xtera's misconduct, Wooley has suffered and will suffer very substantial personal and professional damages for which he seeks recovery from Xtera.

## VII.

### *Retaliation*

101. Wooley incorporates the allegations set forth in paragraphs 1 through 100 above, herein as if set forth verbatim.

102. The false statements made by Xtera constitute slander, slander per se and defamation of Wooley's character personally and professionally because Wooley resigned his position and Xtera was without a senior compliance engineer at a critical stage of its technology development. Consequently, Xtera's misconduct was intentionally calculated towards punishing Wooley for leaving.

103. As a direct and proximate result of Xtera's misconduct, Wooley has suffered and will suffer very substantial personal and professional damages for which he seeks recovery from Xtera.

## VIII.

### *Intentional Tort*

104. Wooley incorporates the allegations set forth in paragraphs 1 through 103 above, herein as if set forth verbatim.

105. The false statements made by Xtera constitute slander, slander per se and defamation of Wooley's character personally and professionally because Wooley resigned his position and Xtera was without a senior compliance engineer at a critical stage of its technology development. Consequently, Xtera intentionally and purposefully made, published and transmitted false statements concerning Wooley, because he resigned.

106. As a direct and proximate result of Xtera's misconduct, Wooley has suffered and will suffer very substantial personal and professional damages for which he seeks recovery from Xtera.

## XI.

### *Actual Damages*

107.  Wooley incorporates the allegations set forth in paragraphs 1 through 106 above, herein as if set forth verbatim.

108.  As a direct and proximate result of Xtera's misconduct Wooley has suffered and continues to suffer very substantial personal and professional damages in an amount not yet ascertained, but which Wooley believes and alleges to be well in excess of the minimum jurisdictional limits of this Court and not less than **$20 million**.

109.  Wooley's damage elements include, but are not limited to the following:

   A.  Physical injury;

   B.  Pain and suffering in the past and in the future;

   C.  Mental anguish in the past and in the future;

   D.  Past and future lost income;

   E.  Past and future loss of earning capacity;

   F.  Past and future medical expense;

   G.  Indelibly and permanently stained reputation; and

   H.  Loss of the enjoyment of life.

## X.

### *Punitive and/or Exemplary Damages*

110.  Wooley incorporates the allegations set forth in paragraphs 1 through 109 above, herein as if set forth verbatim.

111. As a direct and proximate result of the intentional, willful, egregious and outrageous misconduct of Xtera, Wooley is entitled to seek and recover punitive and/or exemplary damages pursuant to §41.001, *et seq.*, TEX. CIV. PRAC. & REM.CODE.

112. Wooley is entitled to recover punitive and/or exemplary damages in an amount not less than **$200,000.00** or **two (2) times** the amount of economic damages plus an amount equal to any non-economic damages not to exceed **$750,000.00**, pursuant to §41.007, TEX. CIV. PRAC. & REM.CODE.

113. As part of the elements of the punitive damages, Wooley will also seek to recover his reasonable and necessary attorneys' fees for the prosecution of this claim and an appeal that may be taken from a judgment in this matter, its litigation costs and expert witness fees.

**WHEREFORE, PREMISES CONSIDERED** Plaintiff Wooley prays for judgment against Xtera Communications, Inc. for:

A. Actual damages in an amount not less than of **$20 MILLION DOLLARS**;

B. Punitive damages in an amount not less than **$200,000.00** or **two (2) times** the amount of economic damages plus an amount equal to any non-economic damages not to exceed **$750,000.00**, including reasonable and necessary attorneys' fees for the prosecution of this claim and an appeal that may be taken from a judgment in this matter, its litigation costs and expert witness fees.;

C. Court costs;

D. Prejudgment interest;

E. Post judgment interest; and

F. Such other and further relief to which the Plaintiff Wooley may show himself to be justly entitled and for which he will ever pray.

Respectfully submitted,

**THE LYNCH LAW FIRM**

By: _____
Jeffrey S. Lynch
Texas Bar No.1272750

13740 Midway Road
Suite 702
Dallas, Texas 75244-4351
(972) 991-0000 – Telephone
(972) 991-0006 - Facsimile

Michael Burrage
Oklahoma Bar No. 1350
**BURRAGE LAW FIRM**
1st United Center
Suite 100
115 North Washington
Durant, Oklahoma 74701
(580) 920-0702 – Telephone
(580) 920-0700 - Facsimile

**ATTORNEYS FOR PLAINTIFF,
PAUL WOOLEY**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION



PAUL WOOLEY, §
§
PLAINTIFF, §
§ CIVIL ACTION NO. 2-02CV-323
VS. §
§
XTERA COMMUNICATIONS, INC., §
§
DEFENDANT. §

## PLAINTIFF'S CERTIFICATE OF INTERESTED PERSONS

NOW INTO COURT COMES Plaintiff, Paul Wooley ("Wooley"), and files his Certificate of Interested Persons, and for same would show unto the Court as follows:

1. Paul Wooley – Plaintiff;
2. Jeffrey S. Lynch – Counsel for the Plaintiff; and
3. Michael Burrage – Counsel for the Plaintiff.

Respectfully submitted,

THE LYNCH LAW FIRM

By: _____
Jeffrey S. Lynch
Texas Bar No.1272750

13740 Midway Road
Suite 702
Dallas, Texas 75244-4351
(972) 991-0000 – Telephone
(972) 991-0006 - Facsimile

Michael Burrage
Oklahoma Bar No. 1350
**BURRAGE LAW FIRM**
1st United Center
Suite 100
115 North Washington
Durant, Oklahoma 74701
(580) 920-0702 – Telephone
(580) 920-0700 - Facsimile

**ATTORNEYS FOR PLAINTIFF,
PAUL WOOLEY**